FILED

JUL 1 2 2018

Clerk, U.S District Court
District Of Montana
Missoula



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cause No. CR 13-30-M-DWM-12 |
| Plaintiff/Respondent, | |
| vs. | ORDER |
| JOSHUA PETERSEN, | |
| Defendant/Movant. | |

This case comes before the Court on Defendant/Movant Joshua Petersen's

motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255.

(Doc. 824.) Petersen is a federal prisoner and is represented by retained counsel.

## I. Preliminary Review

The motion is subject to preliminary review before the United States is

required to respond. The Court must determine whether "the motion and the files

and records of the case conclusively show that the prisoner is entitled to no relief."

28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255

Proceedings for the United States District Courts. A petitioner "who is able to

state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. U.S. Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). But "it is the duty of the court to screen out frivolous applications and eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." Advisory Comm. Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Comm. Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

## II. Background

### A.    Procedural Background

In November 2013, a grand jury indicted Petersen, along with 13 codefendants, of one count of engaging in a child exploitation enterprise, a violation of 18 U.S.C. § 2252A(g) (Count 1), and one count of conspiring to advertise child pornography, a violation of 18 U.S.C. § 2251(d) and (e) (Count 2). (Doc. 129.) The allegations stemmed from the defendants' activities on a child pornography bulletin board, known as the Kingdom of Future Dreams ("KOFD"). From March 2014 to October 2014, all but one of Petersen's codefendants entered plea agreements with the government and received sentences ranging from 180 to 220 months. On June 5, 2014, a Third Superseding Indictment was filed, charging the same two counts outlined above against only Petersen and one other

codefendant, Steven Grovo. (Doc. 477.) A bench trial was held in October 2014, (*see* Min. Entries, Docs. 604, 606, 609; Trial Trs., Docs. 773, 774, 775), and both Petersen and Grovo were found guilty of both counts charged, (*see* Min. Entry, Doc. 609; Trial Tr. 553).

A presentence report was prepared. Petersen's advisory guideline range was 324 to 405 months. Count 1 carried a 20-year mandatory minimum prison sentence upon conviction. Count 2 carried a 15-year mandatory minimum. On January 22, 2015, Petersen was sentenced to 240 months on both Counts I and II, to run concurrently, with fifteen years of concurrent supervision on each count to follow. (*See* Docs. 741, 745.) Petersen was also held joint and severally liable with his co-defendants for $29,859.00 in restitution, now paid. (Judg., Doc. 745; Order, Doc. 694; Satisfaction of Judg., Doc. 816.)

Petersen appealed, (Notice, Doc. 756), and both his conviction and sentence were affirmed,[1] (Docs. 806 (Op.) & 807 (Mem. Dispo.)). Petersen's conviction became final December 27, 2016. *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). He timely filed his § 2255 motion on August 25, 2017. 28 U.S.C. § 2255(f)(1). With the exception of the initial proceedings, Petersen had retained counsel at every stage of the case.

---

[1] The amount of restitution was remanded for recalculation but is not implicated here.

## B.    Trial

Petersen went to trial on two counts: one count of engaging in a child exploitation enterprise, a violation of 18 U.S.C. § 2252A(g) (Count 1), and one count of conspiring to advertise child pornography, a violation of 18 U.S.C. § 2251(d) and (e) (Count 2). (*See* Doc. 477.) The elements of Count 1 are that: (1) the defendant knowingly distributed, received or accessed with intent to view child pornography on three or more separate incidents; (2) the defendant committed the offenses in concert with three or more other persons; and (3) the distribution, receipt or accessing with intent to view child pornography involved more than one victim. 18 U.S.C § 2252A(g). To prove the offense charged at Count 2, the government was required to show that: (1) beginning on or about November 6, 2009 and ending on or about March 19, 2012, there was an agreement between two or more persons to commit the crime of advertising child pornography and (2) the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it. *See* Model Crim. Jury Instr. 9th Cir. (2010 Ed.), Instr. No. 8.20: Conspiracy – Elements.

The government called eleven witnesses at trial, two codefendants—Robert Krise and Philip Morris—and nine law enforcement officers. Law enforcement initially linked Petersen to KOFD after executing a search warrant on the residence of Paul Wencewicz, the Board's creator, in Polson, Montana. (Trial Tr. 13.)

Wencewicz authorized law enforcement to take over his account—user name Dreamer—to access the Board, allowing law enforcement to then identify other members, including Petersen. (Trial Tr. 15.) After receiving a search warrant for Petersen's home in Arizona, law enforcement uncovered three computers, three portable hard drives, three internal hard drives, one flash card, one thumb drive, and two cell phones. (Trial Tr. 18, 77-79; Exs. 9, 10, 11.) Agents also uncovered compact discs containing child pornography that Petersen admitted were his. (Trial Tr. 68; Ex. 12.) Law enforcement found files on Petersen's computer connected to KOFD, (Trial Tr. 439; *see also* Trial Tr. 469 (uncovering 869 matches when compared contents with 58,000 images found on KOFD)), and were also able to connect the username "aqualung" with web history on Petersen's computer, (Trial Tr. 437). Trial testimony established that Petersen was active on the Board under the username "aqualung." (*See* Trial Tr. 17.)

Investigation into KOFD revealed 28,000 threads and over 300,000 images. (Trial Tr. 253.) KOFD had approximately 40 – 45 members with five possible status levels: Castle Dweller, Castle Resident, Legionnaire, Moderator, and Administrator. (Trial Tr. 101, 103.) Castle Dwellers had the lowest level of access while Moderators and Administrators had the highest. (*Id.*) Based on aqualung's "user profile," Petersen was a Castle Resident who first registered with the Board on November 10, 2009 and last accessed it on March 12, 2012. (*See* Ex. 122.)

5

Aqualung made over 400 posts on KOFD across a number of forums. (*See* Ex. 293

(listing number of posts by forum).)

There was no evidence that Petersen had personally met any of the other

KOFD members or that they were aware of his identity. (*See* Trial Tr. 102, 124,

126, 414.) However, Petersen's codefendants testified at trial that they were

familiar with the user aqualung on KOFD, (Trial Tr. 101 (Krise), 393 (Morris)),

and that child pornography was present on the upper levels of the Board, including

full nudes, "slip" images, and "see thru" images, (*see* Trial Tr. 105–07 (Krise)).

Members could create threads, post messages or other content in reply to an

existing posting, or view images without posting anything. (Trial Tr. 111 (Krise);

162 (expert testimony that "Bottom Dwellers" portion of the Board had 435 posts

but 1563 views).) Members were encouraged to post and their accounts could be

rendered "inactive" if they failed to do so. (*Id.*)

The contents of the Board were identified through screenshots taken by a

law enforcement officer posing as a member and a re-creation from a back-up.

That evidence shows aqualung was actively posting. (S*ee* Ex. 104;Trial Tr. 154,

Ex. 102; Trial Tr. 213, Ex. 177; Trial Tr. 221, Ex. 181.) As a Castle Resident,

aqualung had access to certain parts of the upper levels of the Board, including

those containing child pornography. (Trial Tr. 189, 255.) There was also evidence

that aqualung commented on threads addressing child pornography in the upper

levels, including his comment "sweeeet" on the "Stella Buns pt3" thread, which had the "Forum Description" "see thru/slips." (Ex. 260.) On similar threads, aqualung posted the comments: "oh boy oh boy now thats where baby oil belongs," (Ex. 261 at 13), and "she would look great in overalls," (Ex. 259). Aqualung also started a thread titled "Sweet LS Blonde"; LS is a known studio that produces child pornography. (Trial Tr. 265–67; Ex. 266.) Aqualung made further references to "LS" on the Board, including threads located in the Legion's Lounge called "LS at its best," (Trial Tr. 268; Ex. 265), and "Hot LS Individual," (Trial Tr. 270; Ex. 267). Aqualung's activity on the Board was tied to a number of posts and comments addressing child pornography. (*See* Trial Tr. 272–84; Exs. 264, 264A, 262, 268, 268A, 270, 270A, 258, 258A, 263, 263A, 269, 269A, 271, 274A.)

### III. Claims and Analysis

Petersen claims that trial counsel, Penelope Strong, was ineffective in various respects. These claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). At this stage of the proceedings, Petersen must allege facts sufficient to support an inference (1) that counsel's performance fell outside the wide range of reasonable professional assistance, *id.* at 687-88, and (2) that there is a reasonable probability that, but for counsel's unprofessional performance, the result of the proceeding would have been different, *id.* at 694.

### A. Counsel's Opposition to Severance

Petersen claims counsel should not have opposed the governments' attempts to sever his trial from that of his codefendant, Grovo. According to Petersen, Grovo "was by far the most culpable defendant in this charged conspiracy" and counsel should have done "anything she could have to separate her client from this man." (Doc. 825 at 10–11.)

Petersen and Grovo's cases were set for a joint bench trial on Monday, June 23, 2014. (Doc. 474.) On Sunday evening, Grovo attempted suicide while being held at the Missoula County Detention Center. (*See* June 24 hearing transcript, Doc. 772 at 34.) In light of Grovo's previous mental health issues, the suicide attempt, and his subsequent behavior, Grovo was referred to the Bureau of Prisons to undergo a competency evaluation. (Doc. 531.)

On June 23, the government initially opposed severing Petersen and Grovo's trials on the ground that the proof against both defendants was based on the same evidence. (*See* June 23 hearing transcript, Doc. 776 at 15–16 ("I think it would be a complete waste of time, because all of the evidence that the Court is going to hear is exactly the same type of evidence and it would be a complete duplication of efforts.") The government also noted that Petersen opposed severance. (*See id.* at 17.) However, once it became clear that the trial against Grovo was not going to proceed until after a full competency evaluation, the government requested severance because it already had its witnesses in Missoula for the June 23 trial

date.  (June 24 hearing, Doc. 772 at 18, 26–27.)  Strong opposed severance from

the start, (Doc. 776 at 20), arguing "that [the defense] ha[d] always contemplated

joinder" including "joint preparations," (Doc. 772 at 9).  Strong also cited concerns

about the government's recent change in position and the number of available trial

days.  (*Id.*)

Petersen's argument that there was no professionally sound reason for

Strong to oppose severance is not supported by the record.  To the contrary,

supporting joinder was consistent with Petersen's desire to delay trial.  On June 10,

2014, Strong sought a continuance of the trial date, citing a need to review

complex discovery and limited access to the digital materials.  (Doc. 483, 485.)

That motion was supported by an affidavit prepared by Petersen himself, stating

that he agreed with a continuance and wanted more time to personally review the

discovery.  (*See* Doc. 483-1.)  The Court denied the motion to continue.  (Doc. 513

at 5–7.)  However, two weeks later, Grovo's suicide attempt and competency

issues resulted in a de facto continuance, so long as the trials remained joined.

Petersen was on pretrial release and facing a mandatory minimum of 20 years.  The

record shows counsel sought to delay trial and that Petersen agreed:  "The Court is

aware that I have made two motions to continue the case.  While I am prepared to

go, in all candor *my client has asked me to oppose the severance*.  He would like

more time.  We would like more time to review the complex evidence in this case,

9

which we could do." (June 24 hearing transcript, Doc. 772 at 29 (emphasis added).) And, in ruling on the question of severance, the Court specifically stated: "Strong argues that if she is forced to try the case alone, she's willing and able to do so, but that in the interest of Mr. Petersen a joint trial is his and her desire." (*Id.* at 35.) Petersen sat in that very hearing and did not object. Thus, his allegation that counsel "did not discuss the issue of severance with him," (Doc. 825 at 12), lacks merit. Strong's performance did not fall outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 669.

Moreover, Petersen presents no evidence that the government's motion to sever would have been granted, even if it had been unopposed. *C.f. Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (holding that counsel was not ineffective for failing to raise meritless objection); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel."). The Court's reasons for denying severance were multifaceted; the Court stated that such a delay would give Petersen more time to review and evaluate the evidence, the PSRs of the codefendants could be completed, and there "w[ould] be an opportunity for the government to review and assure that its *Brady* obligations are met." (Doc. 772 at 38.) And, as Petersen recognizes, severance is the exception, not the rule. *See Richardson v. Marsh*, 481 U.S. 200, 210 (1987) ("Joint trials generally serve the interests of justice by

avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit.").

Petersen's argument that he was "tainted" by Grovo's presence is not compelling. As argued by the government at both the June 23 and June 24 hearings, the evidence presented at the bench trial against Petersen and Grovo was the same. (Doc. 776 at 16; Doc 772 at 25.) Because they were coconspirators, Grovo's conduct and activity on the KOFD board would be both admissible and relevant to Petersen's case. (*See* Trial Tr. 552.) Petersen makes no showing of how being tried alongside Grovo prejudiced him (his argument regarding Strong's decision not to call an expert witness based on a conflict of interest is discussed separately below). That is especially so given that the trial was a bench—as opposed to jury—trial. Moreover, despite Petersen's characterization, Grovo and Petersen were *both* "Castle Residents," meaning they both had access to some of the upper level boards and forums but were not Moderators or Administrators. (Trial Tr. 173–75.)

This claim is denied.

## B.    Failure to Call Expert Witness

Petersen further argues that Strong was ineffective for failing to call James Andrew Holmes, a digital forensic expert. According to Petersen, Holmes's testimony was anticipated to be the "linchpin" of his defense, rebutting the

government's evidence as to both the alleged advertising and child exploitation. (Doc. 825 at 16, 17.) But, according to Petersen, Holmes's testimony would have been damaging to Grovo because of Grovo's greater culpability, creating a conflict that ultimately lead to Holmes not being called to testify. (*Id.* at 18.) Petersen insists he was prejudiced by that decision. (*Id.*)

Petersen argues that Strong had an actual conflict of interest because her trial strategy equated his culpability with that of Grovo, placing the negative implications for Grovo over the potential benefit to Petersen in deciding not to call Holmes. But Petersen has not shown that Strong actively represented conflicting interests. *See Maiden v. Bunnell*, 35 F.3d 477, 479 (9th Cir. 1994): *United States v. Walker*, 234 F.3d 1279, at *1 (9th Cir. Aug. 14, 2000) (unpublished). Both Petersen and Grovo had separate counsel and there is no suggestion that Strong owed any loyalty to Grovo or Grovo's attorney. "In the absence of an actual conflict of interest, [the petitioner] must show that [counsel]'s decision to pursue the joint defense strategy fell below prevailing professional standards and that this decision prejudiced his defense."[2] *Walker*, 234 F.3d at *1 (citing *Strickland*, 466 U.S. at 687). Petersen fails to do so.

Petersen's second claim fails for a number of reasons. First, he merely

---

[2] Had Petersen been able to show an actual conflict of interest that adversely affected counsel's performance, prejudice would have been presumed. *Strickland*, 466 U.S. at 692.

speculates at the existence of a conflict. (*See* Doc. 825 at 17 ("If [Holmes] were to testify about th[e] joint representation of the two defendants with different degrees of culpability, it is believed that Mr. Holmes, himself, would substantiate that fact."; at 18 ("A strong inference is left that the ultimately decision not to call Holmes was therefore based more on the harm it would cause Mr. Grovo."); at 23 ("Though not being privy to Mr. Holmes' report with regard to co-defendant Steven Grovo, it is strongly believed" it would reinforce disparity between two defendants.).) Petersen provides no evidence what Holmes' testimony about Grovo would have entailed. As discussed above, not only were both defendants of the same status level on the Board, but because it was a conspiracy, they were responsible for each other's conduct. For that reason, even if Petersen was correct that Holmes's testimony could have been harmful to Grovo, it could also have been harmful to Petersen, providing a legitimate reason not to call Holmes. And, to the extent evidence was presented at trial that only had bearing on one of the defendants, the Court limited its admission to that defendant. (*See, e.g.*, Trial Tr. 346, Ex. 292 (Grovo's user profile as "Karomesis" admitted only as to Grovo).)

Second, the decision not to call Holmes was strategic and therefore due deference. *Strickland*, 466 U.S. at 689. This is not a case where counsel failed to investigate a possible witness or defense. *Compare with Lord v. Wood*, 184 F.3d 1083, 1090–92 (9th Cir. 1999). Rather, Petersen insists that Strong performed

13

deficiently when she decided not to call an expert witness after she prepared and

reviewed his materials, (*see* Notice of Alibi, Doc. 825-1; Notice Expert Disclosure,

Doc. 825-2), and heard the government's proof at trial. Given these circumstances,

Petersen cannot show that no reasonable attorney would have chosen not to call

Holmes. *Compare with Thomas v. Chappell*, 678 F.3d 1086, 1104–05 (9th Cir.

2012) (finding *Strickland* error when trial counsel's failure to call a witness could

not be excused as a tactical decision because counsel did not have sufficient

information to make an informed decision).

But, even if Petersen could show counsel's decision not to call Holmes fell

outside "the wide range of reasonable professional assistance," *Strickland*, 466

U.S. at 689, he cannot show that "but for counsel's unprofessional errors, the result

of the proceeding would have been different," *id.* at 694. According to Petersen,

Holmes would have presented "exculpatory evidence" in the form of testimony and

forensic data showing that Petersen was not "around when the[] elements of child

pornography were advertised and/or distributed." (Doc. 825 at 22, 23.) It appears

Holmes would testify that Petersen never made any posts considered child

pornography nor started any threads which received replies containing child

pornography, (*see* Expert Disclosure Notice, Doc. 825-2 at 4), and was not present

when threads, posts, and replies containing child pornography occurred, (*see*

Notice of Alibi, Doc. 825-1 (walking through the individual posts)). Holmes's

purported testimony is not "sufficient to undermine confidence in the outcome" of this proceeding.[3] *Strickland*, 466 U.S. at 694.

The evidence presented at trial is discussed at some length above. It was established that Petersen actively accessed and posted to the Board as aqualung, including on threads containing child pornography. Contrary to Petersen's legal position, it was not necessary for Petersen, acting as aqualung, to be continuously present on the Board, (*see* Doc. 825-1 at 2), or post child pornography himself, (*see* Doc. 825-2 at 4). Nor would it be compelling to merely show that Petersen was "not . . . around" when child pornography was posted. (*See* Doc. 825 at 23.) Petersen presents no evidence or argument for how Holmes's testimony would have undercut the evidence affecting the outcome of the trial. The record in the case conclusively shows that Petersen is not entitled to relief on the grounds raised. *See* 28 U.S.C. § 2255(b). This claim is denied.

## IV. Certificate of Appealability

---

[3] As a preliminary matter, Petersen argues the Court should apply a "cumulative prejudice" standard, relying on *Bemore v. Chappell*, 788 F.3d 1151 (9th Cir. 2015). But *Bemore* addressed cumulative errors across the guilt and penalty phases of a capital case. *See id.* at 1176 ("The two ineffective representation decisions—not putting on a mental health mitigation defense at the penalty phase, and putting on a guilt phase defense both unlikely to succeed and likely adversely to affect the jury's view of [the defendant] for the penalty phase—must be viewed cumulatively in determining whether the *Strickland* prejudice standard was met with regard to the jury's decision to sentence [the defendant] to death."). Consistent with *Strickland*, the alleged unprofessional errors identified by Petersen are all considered to the extent they potentially impacted the outcome of the trial.

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). None of Petersen's claims meet even the relatively low threshold required for a COA. Petersen does not identify any respect in which counsel's performance was unreasonable. Nor does he identify any reasonable probability of a different outcome if counsel had done anything differently. There is no reason to encourage further proceedings. A COA is not warranted.

Accordingly, IT IS ORDERED:

1. Petersen's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Docs. 824) is DENIED;

2. A certificate of appealability is DENIED. The Clerk of Court shall immediately process the appeal if Petersen files a Notice of Appeal;

3. The Clerk of Court shall ensure that all pending motions in this case and in CV 17-114-M-DWM are terminated and shall close the civil file by entering

judgment in favor of the United States and against Petersen.

DATED this __12th__ day of July, 2018.

Donald W. Molloy, District Judge
United States District Court